NORMAN C. SULLIVAN, JR. (State Bar No. 48762)
nsullivan@frvf-law.com
GEORGE J. FOWLER, III (pro hac vice)
fow@frvf-law.com
FOWLER RODRIGUEZ VALDES-FAULI
400 Poydras Street, 30th Floor
New Orleans, Louisiana 70130
Telephone: (504) 523-2600
Facsimile: (504) 523-2705

WILLIAM ROBINSON (State Bar No. 087647)
wrobinson@nixonpeabody.com
KELLY L. KRESS (State Bar No. 246368)
kkress@nixonpeabody.com
NIXON PEABODY LLP
Gas Company Tower
555 W. Fifth Street, 46th Floor
Los Angeles, CA  90013
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

Attorneys for Plaintiffs CRYSTAL
CRUISES, INC. and CRYSTAL SHIP
THREE (BAHAMAS) LTD.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL CRUISES, INC. and CRYSTAL SHIP THREE (BAHAMAS) LIMITED,<br><br>                Plaintiffs,<br><br>   v.<br><br>MOTEURS LEROY-SOMER S.A.; LEROY-SOMER; EMERSON ELECTRIC COMPANY; and DOES 1 through 20, Inclusive,<br><br>                Defendants. | No. 2:10-cv-08736 PSG (JCx)<br><br>**SUPPLEMENTAL OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS OF FOR LACK OF PERSONAL JURISDICTION**<br><br>**[Filed Concurrently with Declaration of Norman C. Sullivan, Jr. as Exhibit A and attaching Exhibits B-AA thereto]**<br><br>**Hearing Date:  January 9, 2012<br>                  1:30 p.m.** |

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

    I.     Background............................................................................................1

    II.    Procedural History..............................................................................4

          A.     Defendants are subject to specific jurisdiction in California..........................................................................5

          B.     Pendant Jurisdiction ..................................................................7

          C.     Defendants are subject to general jurisdiction in California..........................................................................9

          D.     It is entirely reasonable for this lawsuit to proceed against defendants in California........................................15

          E.     Jurisdiction is also appropriate under the representative services doctrine and ostensible authority principals. ....................18

               1.     Representative Services Doctrine.........................................18

               2.     Ostensible Authority.............................................................21

    III.   Conclusion.........................................................................................24

**OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

# TABLE OF AUTHORITIES

**Cases**

*Action Embroidery v. Atlantic Embroidery*, 368 F.3d 1174 (9th Cir. 2004) ..................................................................................7, 8

*Ales-Peratis Foods Int'l, Inc. v. American Can Co.*, 164 Cal.App.3d 277, 209 Cal. Rptr. 917 (Cal. 1985); ...............................17

*Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.,* 1 F.3d 848 (9th Cir. 1993) ............................................................9, 11, 15

*Autogenomics, Inc. v. Oxford Gene Tech., Ltd.,* 566 F.3d 1012, 1018 (Fed. Cir. 2009)..............................................................12

*Bancroft & Masters, Inc. v. Augusta Nat'l, Inc*., 223 F.3d 1082, 1086 (9th Cir. 2000) .................................................................9

*Bauman v. DaimlerChrysler Corp.,* 644 F.3d 909 (9th Cir. 2011) ...................................................................16, 19, 23

*Biakanja v. Irving,* 49 Cal. 2d 647, 320 P.2d 16 (Cal. 1958) ........................................17

*C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 479-80 (9th Cir. 2000) ...................22

*C.E. Distribution, LLC v. New Sensor Corp*., 380 F.3d 1107 (9th Cir. 2003) .............................................................................8

*Calder v. Jones*, 465 U.S. 783, 79 L.Ed.2d 804, 104 S.Ct. 1482 (1984)...........................................................................5, 6

*Calix Networks, Inc. v. WI-LAN, Inc.*, 2010 U.S. Dist. LEXIS 97657 (N.D. Ca. 2010) ...............................................11, 12

*Campbell Pet Co. v. Miale*, 542 F.3d 879, 881-84 (Fed. Cir. 2008) .............................................................................12

*Chan v. Society Expeditions, Inc.,* 39 F.3d 1398 (9th Cir. 1994) ...................................18

*Congoleum Corp. v. DLW Aktiengesellschaft,* 729 F.2d 1240, 1242-43 (9th Cir. 1984) ..............................................................11

*Doe v. Unocal,* 248 F.3d 915, 928 (9th Cir. 2001) ........................................19

*F. Hoffman LaRoche, Ltd. v. Superior Court*, 130 Cal. App. 4th 782, 30 Cal. Rptr 3d 407 (Cal. 205) .........................................18

*Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1330-32 (9th Cir. 1984) .............................................................................11

*Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011)..............................................9, 10

*Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 80
104 S.Ct. 1868, 80 L.Ed. 2d 404 (1984)................................................9

*J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 157 Cal. Rptr. 407
(Cal. 1979). ........................................................................................17

*Kelley v. R.F. Jones Co.,* 272 Cal. App. 2d 113, 120, 77 Cal.
Rptr. 170 (Cal. 1969) ........................................................................22

*Mavrix Photo, Inc. v. Brand Tech., Inc.,* 647 F.3d 1218 (9th Cir.
2011) ..................................................................................................10

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 569
(2nd Cir. 1996).............................................................................11, 12

*Paneno v. Ctrs. for Academic Programs Abroad, Ltd.*, 118 Cal.
App. 4th 1447; 13 Cal. Rptr. 3d 759 (Cal. 2004) ......................9, 18, 23

*Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F.Supp.2d 1048 (N.D.
Cal. 2004).............................................................................................17

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802
(9th Cir. Cal. 2004)................................................................................5

*Shute v. Carnival Cruise Lines,* 897 F.2d 377 (9th Cir. 1990),
*rev'd on other grounds*, 499 U.S. 585 (1991) .....................................16

*Synthes v. G.M. Dos Reis*, 563 F.3d 1285 (Fed. Cir. 2009)..........................12

*Tauzon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1172 (9th
Cir. 2006)......................................................................................10, 11

*United Kingdom Mut. S.S. Assurance Assn. v. Continental
Maritime of San Francisco, Inc.*, 1992 U.S.Dist. LEXIS
13485 (N.D.Cal. 1992) ..........................................................................7

*Wells Fargo & Co. v. Wells Fargo Exp. Co.,* 556 F.2d 406, 423
(9th Cir. 1977) .....................................................................................23

**Statutes**

*Article 2317* of the California Civil Code...................................................21

**OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**

**MAY IT PLEASE THE COURT:**

**NOW INTO COURT**, through undersigned counsel, come plaintiffs, Crystal Cruises, Inc. and Crystal Ship Three (Bahamas) Limited (hereinafter collectively referred to as "Crystal" or "Plaintiffs"), and respectfully submit the instant Supplemental Memorandum in Opposition to the Motions to Dismiss for Lack of Personal Jurisdiction filed by defendants, Moteurs Leroy-Somer, S.A. ("MLS") and Leroy-Somer ("LS") (hereinafter sometimes collectively referred to as "Leroy-Somer") (Docket Event Nos. ("DE") 21 and 24):

## I.    Background

Crystal is a California corporation that operates luxury cruise vessels. Crystal has built its business reputation on an unwavering commitment to delivering its passengers the highest quality service and best oceanic travel experience possible. Repeat passengers constitute a significant portion of Crystal's business.

On December 12, 2000, Nippon Yusen Kaisha, a/k/a "NYK," the parent of Crystal Cruises, Inc., entered into a contract with Chantiers De L'Atlantique ("CAT") for the construction of a new luxury cruise ship, the CRYSTAL SERENITY. As a cruise ship that would travel around the world, the reliability and dependability of its generators was of the utmost concern. LS was selected to manufacture the generators at a cost of approximately $1.9 million. Attached is a photo of one of the generators during construction. (Ex. B). The Declaration of Norman C. Sullivan, Jr. dated December 12, 2011 is concurrently filed as Exhibit A and attaches supporting Exhibits B-AA thereto.

-1-

The vessel's generators supply power to the entire vessel. Most importantly, they supply power to the vessel's propulsion system.  There are six diesel engines, each connected to an 11,000 volt LS generator which provides the electrical power for the vessel, including the vessel's two propulsion "pods" [propellers which are geared so that they can rotate 360°].

During the selection process of LS as the generator vendor, LS and Emerson Electric Company ("Emerson") represented that LS had the requisite experience to complete the work. A presentation was made as to this ability, including numerous references to existing marine applications and a response was made to numerous inquiries.  This information was transmitted by LS to CAT to be sent to NYK and Crystal.  In fact, all of this information misrepresented LS's abilities.  The generators were not properly designed and contained numerous manufacturing defects which necessitated an expensive dismantling and rebuilding over a period of one year.

Emerson and LS marketed themselves as a single corporate entity making no significance of the actual Emerson entity which would manufacture the generators, thereby encouraging NYK and Crystal to rely upon the technological and financial resources and worldwide reputation of Emerson.

While the CRYSTAL SERENITY was undergoing a scheduled dry-docking in November of 2008, partial discharge activity in the generators was first discovered. This activity was created by a breakdown of the insulation encapsulating the copper coils in the generator stators and ultimately resulted in the failure of the generator.

-2-

Improper securing of the coils in the stators and other defects caused the deterioration of the insulation.

A representative of LS inspected the generators in Portugal and made recommendations for repairs. Representatives of LS traveled to California to board the vessel and commenced repairs in January of 2009. These repairs were determined to also be defective and were halted soon thereafter.

In March of 2009 generator no. 6 sustained an electrical failure as a result of the partial discharge degradation. It was determined that the other five generators would also ultimately fail. The defects in the generators were not apparent at the time of sale or prior to the dry-docking of the CRYSTAL SERENITY in November, 2008. It became necessary for Crystal to completely rewind all six generators during the vessel's voyages. This process took about one year, and the costs exceeded $7 million. Crystal now seeks recovery of these costs, including the cost of defective repairs performed in January and February, 2009.

Defendants now seek to shield themselves from responsibility for their actions with their elaborate corporate structure. Emerson had its French affiliate, MLS, manufacture the generators and now attempts to avoid jurisdiction in California by using Emerson and its various business units to sell Leroy-Somer's products in the U.S., including California. This scheme cannot succeed.

## II.     Procedural History

Crystal filed the instant lawsuit against Emerson and Leroy-Somer in November, 2010. Crystal asserts the following claims, amongst others, against Emerson and Leroy-Somer: (1) negligent manufacture; (2) breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for a particular purpose; (4) breach of express warranty; and (5) negligent misrepresentation and concealment.

Crystal maintains that Emerson and Leroy-Somer are liable under a "single enterprise" theory of liability such as the representative services doctrine, and because they represented that LS had ostensible authority from Emerson.  Emerson and LS marketed themselves as a single corporate entity, thereby encouraging NYK and Crystal to rely upon the technological and financial resources and worldwide reputation of Emerson.  (DE 14 at ¶11).  In addition, "LS, either directly or through their agents, and/or alter egos, made representations of material fact regarding the design, quality, performance, reliability, cost-efficiency and maintenance of its generators." *Id.* at ¶59.

Emerson filed an Answer consisting of a general denial on January 18, 2011. (DE 12).  Service on MLS and LS was perfected pursuant to the Hague Convention on March 10, 2011, and April 4, 2011, respectively. (DE 18 and 19).  On April 28, 2011, MLS and LS filed Motions to Dismiss for Lack of Personal Jurisdiction. (DE 21 and 24).

-4-

Crystal filed an Omnibus Opposition to the Motion to Dismiss arguing they were premature, as well as a Motion for Leave to Conduct Jurisdictional Discovery on May 16, 2011.  (DE 37).  On July 1, 2011, this Court found that Crystal had met its burden of establishing a "colorable showing" of personal jurisdiction sufficient to warrant further fact discovery.  (DE 44).  Accordingly, it granted Crystal permission to proceed with limited jurisdictional discovery.

Against this backdrop Crystal submits that jurisdiction over Leroy-Somer is proper in California, and opposes Leroy-Somer's Motion to Dismiss for the following reasons:

**A.    Defendants are subject to specific jurisdiction in California.**

Leroy-Somer is subject to specific jurisdiction. California jurisprudence has established the following three part test to determine specific jurisdiction: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. Cal. 2004).  In determining  the first prong, also known as purposeful direction, the court in *Schwarzenegger* turned to the "effects test" traced to *Calder v. Jones*, 465 U.S.

-5-

783, 79 L.Ed.2d 804, 104 S.Ct. 1482 (1984). Under *Calder*, the "effects" test requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.

Upon discovering the partial discharge problem encountered on the generators, at the November 2008 dry docking, Crystal notified Leroy-Somer.   Leroy-Somer contracted with Crystal to send a technician to the vessel in Portugal to diagnose the problem.  (Ex. C).   Subsequently, Leroy-Somer attempted to repair the generators. Two Leroy-Somer technicians boarded the CRYSTAL SERENITY on January 21, 2009 in Los Angeles to commence these repairs.  (Ex. D).  An invoice for this work in the amount of €58,950 was sent to Crystal at its California headquarters.   (Ex. E). After repairs were made to three out of the six generators the repairs were discovered to be defective and were exacerbating the problem.  The work was stopped.  Crystal paid Leroy-Somer $23,384.34 for the defective repairs for which claim has been made. (Ex. F).

Undoubtedly Leroy-Somer's invoices and deployment of the two technicians into California constitute a "purposeful direction" as defined by *Calder*. It was an (1) intentional act, (2) it commenced the repairs while the vessel was in California and (3) it caused financial harm to Crystal in California.  Crystal's claims for the defective repair work carried out by LS are detailed in ¶16, ¶22, ¶34 and ¶35 of the First Amended Complaint.

-6-

Not only was Leroy-Somer communicating with Crystal in California and sending its technicians to California, but it subsequently admitted that it knew its repairs were experimental.  (Ex. G, Valenti depo. p. 128).  It could reasonably have known that if something went wrong, it would be subject to jurisdiction in California.  *United Kingdom Mut. S.S. Assurance Assn. v. Continental Maritime of San Francisco, Inc.*, 1992 U.S.Dist. LEXIS 13485 (N.D.Cal. 1992).

It has previously been found that a claim for negligent repairs to a cruise vessel was subject to specific jurisdiction in California after a foreign company contracted to perform repairs to the vessel while it was located in California, subsequently supplied parts for the job and sent a representative to California to oversee the repairs.  *United Kingdom Mut. S.S. Assurance Ass'n v. Continental Maritime of San Francisco, Inc.*, 1992 U.S. Dist. LEXIS 13485 (N.D. Cal. 1992).

Accordingly, the court should have specific jurisdiction over Leroy-Somer for Crystal's claims arising out of the defective repair work.

## B.      Pendant Jurisdiction

The court should have pendant personal jurisdiction over Crystal's remaining claims.  The ninth circuit explicitly adopted the concept of pendent personal jurisdiction in *Action Embroidery v. Atlantic Embroidery*, 368 F.3d 1174 (9th Cir. 2004).  In *Action Embroidery* the court recognized that under the doctrine of pendent personal jurisdiction, a defendant may be required to defend a "claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common

-7-

nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.* at 1180. In *C.E. Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107 (9th Cir. 2003)*,* the court relied on *Action Embroidery* and stated "when a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts." *Id.* at 1113 (citing *Action Embroidery,* 368 F.3d at 1181). Further, the facts for both claims do not need to mirror each other. The court in *New Sensor Corp.* extended pendant personal jurisdiction to plaintiff's declaratory relief claim and held:

> [a]lthough the facts underlying the declaratory relief claim do not exactly track the facts underlying the claims for intentional interference with contract and breach of contract, the core facts of the claims are the same. The allegations and counter allegations concern the same basic facts -- competing sales of electronic products – and are sufficiently connected to support pendent personal jurisdiction."

*Id*. at 1113-14.

All of Crystal's claims are based on the same nucleus of facts. That is, all of Crystal's claims relate to Leroy-Somer's involvement with the generators. Accordingly, pendant personal jurisdiction is appropriate and should be exercised over Crystal's claims for the dismantling and rewinding of the generators.

## C.   Defendants are subject to general jurisdiction in California.

Emerson admits it is subject to jurisdiction in California.   Leroy-Somer's contacts with California are sufficient to confer general jurisdiction.

General jurisdiction permits a court to exercise personal jurisdiction over a nonresident defendant when the defendant's activities in the forum are substantial, continuous and systematic, even if the cause of action is unrelated to a defendant's forum-related activities.  *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 80 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc*., 223 F.3d 1082, 1086 (9th Cir. 2000); *Paneno v. Ctrs. for Academic Programs Abroad, Ltd*., 118 Cal. App. 4th 1447; 13 Cal. Rptr. 3d 759 (Cal. 2004).  Once it is determined that the continuous and systematic test is met, courts then evaluate whether it is reasonable to hail a defendant into court in the forum state.  *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.,* 1 F.3d 848 (9th Cir. 1993).  A discussion of the reasonableness requirement is separately addressed below.

The recent *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) has not changed the "continuous and systematic" standard.

In that case two citizens of North Carolina were killed in a bus accident outside Paris, France.  A lawsuit was brought by the heirs alleging negligence in the design, construction, testing and inspection of the tires on the subject bus.  The tires were of a type manufactured by Goodyear Turkey, an indirect subsidiary of Goodyear USA.

The nonresident defendants had no place of business, employees or bank accounts in North Carolina, nor did they solicit business themselves or ship tires to North Carolina customers. A small percentage of tires that were special orders were distributed in North Carolina by other Goodyear USA affiliates. The Court held that this small number of tire sales was insufficient to confer general jurisdiction.

*Goodyear Tires* is distinguishable from the instant case for a number of reasons. Significantly, the Supreme Court noted that plaintiffs failed to timely urge a "single enterprise theory" of liability, i.e. that the status of the Goodyear subsidiaries should be disregarded in favor treating all Goodyear entities as a single business so that jurisdiction over one entity would draw in the other related companies as well. *Id.* at 2857. Also, the nonresident defendants in *Goodyear Tires* did not advertise or market their products in North Carolina. *Id.* at 2852. General jurisdiction must still be evaluated on a case-by-case basis.

To determine whether a nonresident defendant's contacts are sufficiently substantial, continuous and systematic, courts consider longevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets. *Tauzon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1172 (9th Cir. 2006). As is directly relevant here, the Ninth Circuit recently held that evidence that a nonresident defendant advertises in a forum is significant for this analysis when the defendant markets its own product by targeting forum residents. *Mavrix Photo, Inc. v. Brand Tech., Inc.*, 647 F.3d 1218 (9th Cir. 2011) (*citing Tauzon,* 433 F.3d at

-10-

1174; *Congoleum Corp. v. DLW Aktiengesellschaft,* 729 F.2d 1240, 1242-43 (9th Cir. 1984)).  This analysis is fact intensive and conducted on a case-by-case basis.  *Tauzon,* 433 F.3d at 1168 (9th Cir. 2006), *cert. denied,* 127 S.Ct. 723, 166 L.Ed.2d 560 (2006); *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.,* 1 F.3d 848, 850 (9th Cir. 1993). Leroy-Somer markets its products in California through Emerson employees.  (Ex. H, Sajewich depo. p. 18).  It also participates in Trade Fairs in the state; for example, it participated in the WINDPOWER 2011 Conference & Exhibition held at the Anaheim Convention Center in May, 2011.  (Ex. I, Ottoson affidavit).  Leroy-Somer sent at least one representative from France to the conference – Philippe Verney.  (Ex. H, Sajewich depo. p. 90).  LS manufactures products which are incorporated into wind turbines and it is interested in growing its business as the use of wind power expands.  (Ex. H, Sajewich depo. pp. 87-88).

The phrase "continuous and systematic" necessarily requires that courts evaluate a defendant's contacts with the forum state over time.  *Calix Networks, Inc. v. WI-LAN, Inc.*, 2010 U.S. Dist. LEXIS 97657 (N.D. Ca. 2010) (*quoting Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 569 (2nd Cir. 1996)).  There is scant case law within the Ninth Circuit specifically discussing whether a party's contacts with the forum state at the time the cause of action arose should be considered.  However, there is support for this analysis in *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1330-32 (9th Cir. 1984), where the court analyzed whether general jurisdiction existed over defendants for a three year period around when a distributorship agreement was

-11-

entered and that agreement formed the basis for at least two causes of action in the Complaint. The inquiry should be particularly relevant in this case because the defects complained of were latent.

An exact timeframe for evaluating these contacts does not exist; courts have typically used a period spanning three-to-eight years. *Calix Networks,* 2010 U.S. Dist. LEXIS 97657 at pp. 11-12 (*citing Autogenomics, Inc. v. Oxford Gene Tech., Ltd.,* 566 F.3d 1012, 1018 (Fed. Cir. 2009) (five year period); *Synthes v. G.M. Dos Reis*, 563 F.3d 1285 (Fed. Cir. 2009) (four year period); *Campbell Pet Co. v. Miale*, 542 F.3d 879, 881-84 (Fed. Cir. 2008) (eight-year period); and *Metro. Life Ins. Co.*, 84 F.3d at 569 (finding that contacts in general jurisdiction cases are commonly assessed over a period of three to seven years)).

The relevant timeframes here are when defendants made the presentation to be selected as the generator vendor in early 2001 and when suit was filed in 2010.

Leroy-Somer has a long history of dealings in California. In 1983, LS formed a subsidiary, KB Holdings, to purchase a California company known as King Bearing, Inc. ("King Bearing") so that it could utilize King Bearing's offices to sell LS products in the California market. The stockholders of King Bearing were paid a total of $8,066,536.72 for their stock in the company, KB Holdings contributed additional capital of $10,000,000 to King Bearing, and KB Holdings assumed responsibility for $37,000,000 in loans and lines of credit. (Ex. J, Oranges affidavit).

In 1983, King Bearing had annual sales in excess of $100 million and over thirty (30) branches in the southwest. Most of its branches and sales were in California. By 1998, King Bearing had approximately one hundred (100) branches and approximately $200 million in annual sales. KB Holdings had set a goal of $30 million in sales of LS products by 1988. (Ex. J, Oranges affidavit). Jean-Paul Montupet, LS's Chairman, moved to California to run King Bearing and integrate LS's products into King Bearing's distribution chain. LS shared office space with King Bearing in Costa Mesa, California, and King Bearing employees performed work for LS. (Exhibit K, Waier Declaration).

LS has also invoked the privilege of using California courts. In 1987 it filed a suit against certain former shareholders of King Bearing, Inc. Cross-claims were subsequently filed by the former shareholders against LS. The former shareholders obtained a judgment of approximately $34.6 million against LS. The case was ultimately settled in 1998 with a sizeable payment in the millions of dollars. (Ex. K, Waier Declaration). In an ancillary proceeding LS actually obtained a judgment against a former shareholder, Caryl Oranges, for $302,832.07 in April, 1998. (Ex. L). Thus, the litigation involving Leroy-Somer's entry into the California market continued to within three years of February of 2001, when LS made its presentation to obtain the contract to build the generators.

LS sold King Bearings in 1990 for $17 million in cash and repayment of $54 million in debt. (Ex. M, web page and Ex. K, Waier Declaration). At that time it had

-13-

$258 million in annual sales (Ex. K, Waier Declaration); nonetheless, Leroy-Somer continues to sell its products in California through the "business units" of Emerson. Emerson's business model has it selling Leroy-Somer products in California and the U.S. (Ex. H, Sajewich depo p. 18). It does this through its divisions, Leroy-Somer North America, Leroy-Somer Power & Drives, U.S. Electrical Motors and Control Techniques. (Ex. H, Sajewich depo. p. 19). In 1999, Claude Henry served as president of LS and also was a Group Vice President of Emerson. (Ex. N).

Through these Emerson business units, MLS sold $556,278.88 of its products in California between 2006 and 2010. (Ex. O). (Ex. H, Sajewich depo. pp. 58-61). An additional $554,516.16 of products from other LS entities were sold in California during this period for a total sales of $1,110,795.04. (Ex. P). (Ex. H, Sajewich depo. pp. 58-61). Emerson does not believe sales records before these dates are available. (Ex. H, Sajewich depo. p. 71). A fair number of products sold by Leroy-Somer Power & Drives were replacement parts for Leroy-Somer products. (Ex. H, Sajewich depo. pp. 94-95). In other words, there is a larger quantity of Leroy-Somer products in California for which replacement parts are purchased. MLS sold generator parts to Crystal in June 2009, valued at €7,753.08, invoicing Crystal in California. (Ex. Q).

In February, 2009, sent an offer to Crystal in California to manufacture a new stator for €132,010 (approximately $180,000.00). (Ex. R). In subsequent months it corresponded with Crystal in California providing information and documents to assist in the generator rewinding efforts.

-14-

Emerson has an extensive distribution system in California to sell Leroy-Somer products.   Leroy-Somer North America has sales representatives in San Ramon, Cerritos and Carlsbad, California.  (Ex. S).  U.S. Electrical Motors sells Leroy-Somer products to Applied Industrial Technologies.  This company is the successor of King Bearings, which was formerly owned by LS.  Applied Industrial Technologies has thirty-two sales outlets in California.  (Ex. T).  In October 2010, Emerson sold its U.S. Electrical Motors division to Nidec Corporation, which continues to sell Leroy-Somer products in California.  Nidec has twenty-two distributors in California which have fifty-five branches throughout the state.  (Ex. U).

## D.   It is entirely reasonable for this lawsuit to proceed against defendants in California.

The second prong of the test to determine whether it is appropriate to assert both general and specific jurisdiction is based upon reasonableness.  The Ninth Circuit balances the following factors to make this determination: (1) the extent of purposeful interjection; (2) the burden on the defendant to defend the suit; (3) the extent of the conflict with the sovereignty of defendant's state; (4) the forum state's interest in the dispute; (5) the most efficient forum for resolution of the matter; (6) the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.  *Amoco Egypt Oil Co. v. Leonis Navigation Co.,* 1 F.3d 848 (9th Cir. 1993). The burden is on <u>defendants</u> to present a compelling case that the exercise of jurisdiction would in fact be unreasonable. *Id.; Shute v.*

-15-

*Carnival Cruise Lines,* 897 F.2d 377 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991) (emphasis added).

A weighing of these factors shows it is entirely reasonable to require LS to defend itself in California. Crystal's principal place of business is located in Los Angeles. Given the amount of harm to California-based plaintiffs, California has a significant interest in this dispute. The evidence supporting Crystal's claim for damages, and possibly other elements of its case, is located at Crystal's principal place of business in California. Emerson's divisions market and sell Leroy-Somer products in California through an extensive distribution system.

Leroy-Somer knew that its generators were for a cruise liner which, by its very nature, would traverse the world. Discovery in this case will involve not only activity in France, but also activity in California, Japan, England, and the expected testimony of witnesses from around the globe.

The fact that LS has interjected itself into California by virtue of filing a lawsuit is also relevant. *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 925, (9th Cir. 2011). The burden for an international company, such as Leroy-Somer, is slight. *Id*. at 926.

LS markets itself as a member of the Emerson Group with 10,000 employees worldwide. (Ex. V). It represents that it operates 470 sales outlets and service centers worldwide. *Id*.

A "special relationship" also existed between Leroy-Somer and Plaintiffs. Leroy-Somer had direct contact with the Plaintiffs' representatives, NYK, through the

-16-

shipyard (CAT), and through written correspondence, including the furnishing of diagrams and other informational materials, in which Leroy-Somer informed them that they could provide suitable generators.  (Ex. W (Leroy-Somer Marketing Brochure)).  It is believed that Leroy-Somer knew the CRYSTAL SERENITY would be operated by a California company.   In California, a service provider may be held liable in negligence for purely economic damages in the absence of physical damage to other goods or injury to persons where a "special relationship" exists.  *Ales-Peratis Foods Int'l, Inc. v. American Can Co.*, 164 Cal.App.3d 277, 209 Cal. Rptr. 917 (Cal. 1985);  *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F.Supp.2d 1048 (N.D. Cal. 2004).   This rationale was first set forth in *Biakanja v. Irving,* 49 Cal. 2d 647, 320 P.2d 16 (Cal. 1958) and further clarified in *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 157 Cal. Rptr. 407 (Cal. 1979).   In these cases, the California Supreme Court recognized that economic damages can be recovered if a special relationship exists between the parties that gives rise to a duty on the part of the defendant to use due care to avoid economic injury to the plaintiff.  Such a duty can arise from statute, contract, the nature of the defendant's activity, the relationship between the parties, or "event he interdependent nature of human society." *Id*.

Considering all of the foregoing, it is entirely reasonable to require Leroy-Somer to defend itself in California.

**E.      Jurisdiction is also appropriate under the representative services doctrine and ostensible authority principals**.

Jurisdiction is also appropriate under "single business enterprise" theories. Adjudicating claims against corporations with worldwide operations and subsidiaries, with product distribution within the United States limited to certain corporate entities can present scenarios which do not fit neatly into a traditional jurisdictional analysis. Consequently, courts have exercised jurisdiction over such companies pursuant to the representative services doctrine and ostensible authority theories.   Both of these theories are applicable herein.

**1.      Representative Services Doctrine**

The representative services doctrine is a type of agency relationship that supports the exercise of jurisdiction when a local subsidiary performs a function that is compatible with, and assists the parent in the pursuit of, the parent's own business. *F. Hoffman LaRoche, Ltd. v. Superior Court*, 130 Cal. App. 4th 782, 30 Cal. Rptr. 3d 407 (Cal. 2005); *Chan v. Society Expeditions, Inc.,* 39 F.3d 1398 (9th Cir. 1994).  The representative services doctrine has been applied outside of the parent-subsidiary context where two companies are separately owned affiliates, but one company functions in furtherance of the other company's business, i.e., where one company does what the other company would have otherwise done itself.  *Paneno,* 118 Cal.App. 4th 1447.

-18-

In evaluating the applicability of the doctrine to a particular case, the Ninth Circuit employs a three-prong test: (1) sufficient importance; (2) control; and (3) reasonableness. *Bauman v. DaimlerChrysler Corp.,* 644 F.3d 909 (9th Cir. 2011). These factors are not evaluated with equal weight; the first factor is given the greatest weight. *Id.* at 922.

In *Bauman*, plaintiffs sued DaimlerChrysler ("DCAG"), a German corporation, alleging that one of its subsidiaries, Mercedes Benz Argentina ("MBA"), collaborated with Argentine security forces to detain, torture and kill former employees of MBA during Argentina's "Dirty War." *Id.* at 911-12. The question presented was whether DCAG was subject to general jurisdiction in California based upon the contacts of its subsidiary, Mercedes Benz USA ("MBUSA"). MBUSA was responsible for distributing Mercedes Benz throughout the United States, including California.

The trial court granted DCAG's Motion to Dismiss. *Id.* Plaintiffs appealed to the Ninth Circuit, which reversed.

The Ninth Circuit applied the three-prong test as follows: it first defined the "sufficiently important test" as a measure of whether the services performed by a local affiliate are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services. *Id.* at 921 (*quoting Doe v. Unocal,* 248 F.3d 915, 928 (9th Cir. 2001)). Here, there is no question that the first prong of this test is satisfied because without Emerson and its network of business units. There would be

-19-

no sales of Leroy-Somer's products in California. Leroy-Somer would be forced to market and distribute its products in California on its own behalf.

Leroy-Somer maintains that it does not sell its products in California. Rather, it sells its products to divisions of its parent, Emerson [Leroy-Somer North America, Leroy-Somer Power & Drives and U. S. Electrical Motors] which then sell the products to California customers. (Ex. H, Sajewich depo. pp. 17-19). These companies were the ones which promoted and marketed LS's products (Ex. H, Sajewich depo. pp. 29-31) and which did business with California companies which had extensive distribution networks.

Here, the services provided to LS and MLS by Emerson for the selling of their products in California are sufficiently important that, without Emerson, MLS would have to perform the services itself.

Emerson markets MLS's products. For example, its Leroy-Somer Power & Drives unit distributes MLS brochures and has face-to-face meetings with its customers, including those in California. (Ex. H, Sajewich depo. pp. 29-31). To sell MLS products Emerson divisions would communicate with MLS sales personnel to get quotes on the cost and follow-up on orders and any other information they need to sell the products. (Ex. H, Sajewich depo. pp. 51-53). The customers in California do not even communicate with MLS (Ex. H, Sajewich depo. pp. 66-67). Leroy-Somer would provide catalogues, brochures, application information and rating tables to the Emerson companies. Maintenance manuals and spare parts information from MLS

-20-

would be passed on to their customers.  (Ex. H, Sajewich depo. p. 56).  MLS's products are shipped to the Emerson companies and they, in turn, ship them to the customers in California.  (Ex. H, Sajewich depo. p. 65).  MLS would invoice the Emerson companies and they would resell the products to California customers with a markup.  (Ex. H, Sajewich depo. pp. 68-69).  LS appointed a company, Shermco Industries, to perform all of its warranty work in the U.S.  (Ex. H, Sajewich depo. pp. 81-82).  The transportation of MLS products is managed by Emerson Logistics.  (Ex. H, Sajewich depo. p. 93).  Without Emerson, MLS cannot sell its products in California.  Jurisdiction over Emerson in this forum is jurisdiction over Leroy-Somer.

Control should not be a factor here since the parent, Emerson, is the company acting for its subsidiary, Leroy-Somer.  In essence, Leroy-Somer has allowed the control of its sales, marketing and other activities to fall into the hands of its parent, Emerson.  Based upon this business plan, there would be no sales of Leroy-Somer's products in California without the activities of Emerson.  Or, it could be said that there is control of Emerson by Leroy-Somer in the context of Emerson selling Leroy-Somer products at Leroy-Somer's request in order to further the interests of Leroy-Somer.

The reasonableness of hailing LS into court in California is addressed herein in Section "D."

### 2.    Ostensible Authority

It is also appropriate to assert jurisdiction over Leroy-Somer under ostensible authority principals.  *Article 2317* of the California Civil Code provides that ostensible

-21-

authority exists when a principal, intentionally or by want of ordinary care, causes or allows a third person to believe that certain authority exists which, in reality, does not. An agent's authority may be implied from the circumstances of a particular case and may be proved by circumstantial evidence. *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.,* 213 F.3d 474, 479-80 (9th Cir. 2000) (*citing Kelley v. R.F. Jones Co.,* 272 Cal.App.2d 113, 120, 77 Cal. Rptr. 170 (Cal. 1969).

This is exemplified in the presentation, *Emerson A Century of Manufacturing/Leroy-Somer A Century of Experience*, made by Emerson/LS to become the generator vendor. (Ex. W). Emerson presented and marketed itself as a world-wide organization with many businesses, including its Leroy-Somer Brand. MLS did not present or market itself as an independent manufacturer of generators. Rather, it presents itself as "Leroy-Somer," a single corporate enterprise with Emerson. It encouraged the world, including Crystal and its parent, NYK, to rely on the technological financial resources and world-wide reputation of Emerson. Crystal relied upon this in agreeing to have LS manufacture the generators. (Ex. G, Valenti depo. pp. 40-42, 48, 82-85).

The presentation describes LS as one of Emerson's main businesses. (Ex. H, Sajewich depo. p. 44). In 1999, it claimed $169 million in sales in North America. (Ex. H, Sajewich depo. p. 48). It appears that these are sales by Emerson's Leroy-Somer North America division. (Ex. H, Sajewich depo. p. 48). It has thirty-four production sites, 7,900 employees and 470 sales outlets and service centers throughout

-22-

the world.  (Ex. H, Sajewich depo. pp. 44, 46).  The name, MLS, does not even exist in the presentation.

For service in the U.S., LS directs its customers to contact LS/USEM Emerson Electric Co. in St. Louis.  (Ex. X).  Emerson itself, rather than a LS entity, has production facilities in China and the U.S. where it manufactures products that it brand names "Leroy-Somer."  (Ex. H, Sajewich depo. pp. 21-24).  Likewise, LS lists itself only as LS when it diagrams its construction process of an alternator (generator).  (Ex. Y).  In marketing its products as "Marine Solutions" LS refers only to LS and Emerson Industrial Automation.  (Ex. Z).

Crystal is asking the court to retain jurisdiction over a foreign subsidiary based on its jurisdiction over its parent company in California.  Courts have applied this doctrine outside the parent-subsidiary context.  *Paneno,* 118 Cal.App. 4th at 1450; *Bauman,* 644 F.3d 909.  "It is clear that whether the alleged general agent was a subsidiary of the principal or independently owned is irrelevant." *Bauman,* 644 F.3d at 922 (*quoting Wells Fargo & Co. v. Wells Fargo Exp. Co.,* 556 F.2d 406, 423 (9th Cir. 1977)).   In *Paneno*, for example, the doctrine was used to confer jurisdiction over a foreign affiliate company which jointly marketed and administered study abroad programs with a California-based company.  *Paneno,* 118 Cal.App. 4th at 1450.

Leroy-Somer presents itself to the world as a member of the Emerson Group and that "… it has developed a long-term growth strategy, backed up by the resources and synergies offered by a large international group."  (Ex. V).  Leroy-Somer also conducts

-23-

its business in this fashion.  After the failure of the No. 6 generator in March 2009, three LS representatives attended a meeting in early April aboard the vessel in Hong Kong.  (Ex. AA).  Their business cards reflected that they were Stephane Amancy, Leroy-Somer Product Service Manager; Xavier Andre, Leroy-Somer Deputy Manager, Customer Support; and Antoine Vitoux, Leroy-Somer, Emerson Industrial Automation Sales Director.

Here, Emerson is a multinational corporation conducting its worldwide business operations through a myriad of related corporate entities.  It nevertheless represents that all companies are part of "Emerson," thereby encouraging prospective purchasers of its products to rely upon the vast resources, expertise and worldwide reputation of Emerson.

LS now seeks to use this same international network as a liability shield against Crystal's claims.  A worldwide corporation such as Leroy-Somer utilizing California markets through its parent company to achieve profits from California sales should be subject to jurisdiction in California.  It is for this very reason that courts have previously invoked the representative services doctrine and principals of ostensible agency to confer jurisdiction under similar circumstances.

### III.   Conclusion

Based upon the foregoing, Crystal submits that it is proper for this court to assert both general and specific jurisdiction over Leroy-Somer in California.  In the event the court does not find Leroy-Somer's contacts fit into these traditional jurisdictional

-24-

analyses, it should instead find that asserting jurisdiction is entirely appropriate pursuant to the representative services doctrine and ostensible agency theories in that Emerson and Leroy-Somer are acting as a "single enterprise."  Defendants' Motion to Dismiss should be denied.

DATED:      December 12, 2011

                                    Respectfully Submitted,

                                    **FOWLER RODRIGUEZ VALDES-FAULI**

                                    By:     */s/ Norman C. Sullivan, Jr.*
                                            Norman C. Sullivan, Jr.
                                            (State Bar No. 48762)
                                            George J. Fowler, III
                                            (admitted *pro hac vice*)

                                    and

                                    **NIXON PEABODY LLP**

                                    By:     */s/ William L. Robinson*
                                            William L. Robinson
                                            (State Bar No. 087647)
                                            Kelly L. Kress
                                            (State Bar No. 246368)
                                            Attorneys for Plaintiffs
                                            CRYSTAL CRUISES, INC. and
                                            CRYSTAL SHIP THREE
                                            (BAHAMAS) LIMITED

1
2

# **CERTIFICATE OF SERVICE**

3

I hereby certify that I have on this 12th day of December, 2011, I served a copy

4

of the foregoing pleading on counsel for all parties to this proceeding, by fax, e-mail or

5
6

by mailing the same by United States Mail, properly addressed, with first-class postage

7

prepaid.

8

/s/ Norman C. Sullivan, Jr.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
FOR LACK OF PERSONAL JURISDICTION**